1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10  CAROLYN M. LOPEZ,

11            Plaintiff,                    No. CIV S-07-1920 EFB

12        vs.

13
    MICHAEL J. ASTRUE,
14  Commissioner of Social Security,

15            Defendant.                    ORDER
    _____/
16

17        Plaintiff filed this action seeking review of a final decision of the Commissioner of Social

18  Security ("Commissioner") denying her applications for Disability Income Benefits and

19  Supplemental Security Income under Titles II and XVI of the Social Security Act, respectively.

20  Pending are the parties' cross-motions for summary judgment. For the reasons discussed below,

21  the court denies plaintiff's motion and grants defendant's cross-motion.

22  I.    BACKGROUND

23        Plaintiff, born on April 1, 1970, applied for Disability Insurance Benefits ("DIB") and

24  Supplemental Security Income ("SSI") on February 14, 2003, alleging disability since January 1,

25  2002. Administrative Record ("AR") 65-67. On July 23, 2003, the Commissioner denied

26  plaintiff's applications on the basis that plaintiff lacked the requisite disability. AR 38-41.

                                              1

Plaintiff requested reconsideration of the denials, but the Commissioner denied plaintiff's request on March 17, 2004.  AR 32-36.  On May 19, 2004, plaintiff formally requested a hearing.  AR 30-31.

On May 9, 2006, a hearing was held before administrative law judge ("ALJ") William L. Stewart, Jr.  AR 614-42.  Plaintiff was represented by counsel and testified at the hearing, along with vocational expert ("VE") C. Kay Wise.  *Id.*  The ALJ issued a decision on August 22, 2006, finding that plaintiff is not disabled.[1]  AR 16-27.  The ALJ made the following specific findings:

> 1.  The claimant met the insured status requirements of the Social Security Act through March 31, 2003.
>
> 2.  The claimant has not engaged in substantial gainful activity since January 1, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

---

[1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq.*  Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. §§ 1382 *et seq.*  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) and 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  *See* 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 and 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater,* 81 F.3d 821, 828, n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  *Bowen*, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  *Id.*

\*\*\*

3.  The claimant has the following severe impairments: fibromyalgia, myofascial pain syndrome, migraine headaches, morbid obesity, mild degenerative joint disease, depression, and opioid dependency (20 CFR 404.1520(c) and 416.920(c)).

\*\*\*

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

\*\*\*

5.  After careful consideration of the entire record, the undersigned finds that the claimant retains the residual functional capacity to lift 20 pounds occasionally and lift and carry 10 pounds frequently, has a limited capacity to stand and walk, however, she can stand and walk at least two hours of an eight-hour work day and sit at least six hours of an eight-hour work day, although she needs an opportunity to change positions. She cannot climb ladders or scaffolds, and can only occasionally climb stairs, negotiate ramps, balance, stoop, kneel, crouch or crawl. Furthermore, she is capable of following simple instructions, but has moderate limitations understanding, remembering and carrying out detailed instructions.

\*\*\*

6.  The claimant is unable to perform any of her past relevant work (20 CFR 404.1565 and 416.965).

\*\*\*

7.  The claimant was born on April 1, 1970, and was 31 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determinations of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can

perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

*** 

11.  The claimant has not been under a "disability," as defined in the Social Security Act, from January 1, 2002, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

AR 20-27.

Plaintiff requested that the Appeals Council review the ALJ's decision.  AR 13-15.  On July 20, 2007, the Appeals Council denied review, and the ALJ's decision became the final decision of the Commissioner.  AR 7-10.

II.  MEDICAL EVIDENCE

In April 2002, plaintiff was diagnosed with acute cephalgia, a history of migraine headaches, a sinus infection, and acute chest pain.  AR 212, 215.  In June 2002, after plaintiff complained of pain in her neck and low back and numbness in her upper extremities, Dr. Glen O'Sullivan, M.D., Board Certified Orthopaedic Surgeon, ordered an MRI study of her neck and low back and diagnosed plaintiff with possible fibromyalgia.  AR 135.  He referred plaintiff to a pain and neurology specialist, Dr. Jeremy Goodwin, M.S., M.D.  *Id.*  In July 2002, Dr. Alan Cohn, D.O., diagnosed plaintiff with endometriosis, myofascial pain syndrome, insomnia, depression, and morbid obesity.  AR 280-81.

In August 2002, Dr. Goodwin confirmed that plaintiff has fibromyalgia, as well as degenerative changes of the cervical and lumbar spine; migraine without aura; Restless Legs Syndrome; probable myofascial pain; remnants of post-traumatic stress disorder; and dysthmia or, possibly, depression likely to have resulted from the chronicity of her pain.[2]  AR 238, 240-41.

////

---

[2]  In November 2002, Dr. Timothy Peters, Board Certified in Internal Medicine and specializing in Rheumotology, examined plaintiff and concurred with a myofascial pain along the line of fibromyalgia diagnosis.  AR 154.

4

Dr. Goodwin further found that plaintiff "suffers from symptoms of 'fibro fog' wherein her ability to concentrate and focus on projects and reading etc. is increasingly becoming impaired"; has "irritable bowel symptomatology (abdominal cramping and alternative diarrhea and constipation) as well as irritable bladder syndrome where she has to urinate quite frequently"; and "has headaches at least 4 days of the week." AR 238-39. He added that "[i]n terms of her activities of daily living, she neither lets her headaches nor her chronic pain get the better of her." AR 240.

That same month, plaintiff told Dr. Cohn that she was doing "significantly better" with her depression. AR 278. The next month (September 2002), plaintiff told Dr. Cohn that she was "doing better" and had not had a migraine, which was probably due to the vitamin supplements, and that her depression and sleeping patterns were better. AR 275. In October 2002, Dr. Goodwin stated that plaintiff was "doing wonderfully" and "only had two minor migraines in the past two months [which was] a huge improvement." AR 237. He added that "[o]verall, she is doing so much better." *Id.*

In December 2002, Dr. Goodwin indicated that plaintiff "only had one migraine over the past month and no other headaches at all." AR 235. He indicated that her endometriosis "is problematic every time she has a menstrual period" but that the medication she was on "has made a huge difference to her pain." *Id.* Dr. Goodwin stated that the medication "not only eliminates the endometriosis-related pain but it also eliminates her fibromyalgia pain to the point where it becomes the most functional and productive time[s] during the whole month!" *Id.* At that time, Dr. Goodwin also started her on OxyContin because she "is very energetic [and] participates in a lot of activities with her husband and her son," and Dr. Goodwin wanted "to encourage this as much as possible." AR 236.

In January 2003, Dr. Goodwin again evaluated plaintiff. AR 233. After acknowledging plaintiff's numerous medical conditions, he stated that "things have changed immensely!" *Id.*
////

He indicated that "she has gone through a number of stressful situations without the usual exacerbation of pain" and that "[h]er frequency of migraine has dropped from several times per week to once monthly and this has been consistent now for two or three months." *Id.* He stated that the combination of her IR oxycodone tablets and OxyContin "works wonderfully well" and that plaintiff "is able to do housework, baking, interacts far more actively with her family, was very active around the Christmas holidays, has more energy and feels 'more myself.'" *Id.* Dr. Goodwin stated that plaintiff "seems to be a different person entirely" and "[n]ow that her pain is well controlled she is very much more functional and doing really well." *Id.* He concluded by stating that plaintiff "has done so well that I can discharge her from my clinic and she need come here only should her situation change dramatically." AR 234.

Also in January 2003, Dr. Cohn indicated that plaintiff had elevated liver enzymes likely due to her use of Tylenol, and recommended that plaintiff try to eliminate as many medications as possible. AR 171. From January through March 2003, Dr. Cohn refilled plaintiff's medications. AR 265-67.

In March 2003, Dr. Goodwin wrote a letter to Blue Cross/Blue Shield Federal Employee Program indicating that the use of an interferential muscle stimulator for plaintiff was medically justified. AR 231. He stated that plaintiff has various painful conditions and that any treatments that would minimize the various pains that she suffers would be of great help. *Id.*

In April 2003, plaintiff told Dr. Cohn that her "pain control is good" and that she was "doing fairly well" and was "well satisfied w/her pain control." AR 262. The next month, plaintiff told Dr. Cohn that she wanted to increase her narcotic medication, that her "energy is good, her depression is fairly well controlled," and that she planned to travel to Utah. AR 260.

In June 2003, Dr. Thomas J. Andrews, M.D., Board Certified Psychiatrist, diagnosed plaintiff with major depressive disorder, and found that she had a Global Assessment of

////

////

Functioning ("GAF") of about 60.[3]  AR 181.  He indicated that plaintiff "could deal with a job, the public, and supervisors, and fellow employees" and "has no severe mental disorder that would prevent her from working."  *Id.*  He further indicated that plaintiff's "main issue . . . is chronic pain and inability to function, the stress of having her husband in the military is also a factor."  *Id.*

Also in June 2003, plaintiff went to Mercy Medical Center complaining of sinus pain and headaches.  AR 197.  The attending physician noted that plaintiff did not want any of the non-narcotic treatment options he gave her, but, instead, had asked the nurse to give her a Demerol shot.  AR 198.  Plaintiff denied asking for Demerol when confronted by the attending physician, and left the hospital without signing the aftercare acknowledgment sheet.  AR 198-99.

In July 2003, state agency physician David Pong, M.D., reviewed the record and opined that plaintiff could perform a reduced range of light work that included occasional postural limitations.  AR 312-20.  Also in July 2003, Irwin Lyons, M.D, Ph.D., reviewed the record and opined that plaintiff could perform simple work.  AR 321-34, 337-41.

In August 2003, plaintiff went to Mercy Medical Center complaining of flu-like symptoms and a headache.  AR 192.  Plaintiff generally reported that her headaches were under control with vitamin supplements.  Upon discharge, plaintiff asked the attending physician for morphine and Demerol, and the attending told plaintiff that narcotics are not proper treatment for migraine headaches.  AR 194.

In September 2003, plaintiff complained that she had a "bad month" with a painful period.  AR 253.  However, the next month, October 2003, plaintiff reported her depression was

---

[3]  The GAF Scale "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  The American Psychiatric Association's Multiaxial Assessment, set forth in the Diagnostic and Statistical Manual of Psychiatric Disorders, ("DSM-IV") (4th ed. 2005), at 34.  A GAF of 51 to 60 denotes "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

"fairly well controlled" and that she had not had a significant migraine headache in two months. AR 250.

In November 2003, plaintiff returned to see Dr. Goodwin and told him that her pain overall had increased dramatically. AR 229. Dr. Goodwin indicated that much of it was due to the cold weather and that she was under a great deal of stress, which worsens her experience of pain. *Id.* He modified her medication regimen, but also stated that her migraines were "still under good control using simply vitamin B and . . . magnesium supplements." AR 229, 230. In December 2003, Dr. Goodwin again evaluated plaintiff and made some modifications to her medication regimen. AR 227-28.

In January 2004, plaintiff told Dr. Cohn that she was "doing fairly well" and that her pain control was "fairly good." AR 246. In February 2004, Dr. Cohn noted that plaintiff "continues to get fairly good pain control" from her medication. AR 558. In March 2004, Dr. Cohn adjusted her medication regimen, and she reported that "she's doing fairly well," but felt sedation with the change to methadone. AR 557, 554.

On March 10, 2004, a state agency doctor reviewed the record and affirmed Dr. Pong's opinion that plaintiff could perform a reduced range of light work. AR 320. On March 12, 2004, Marlo Morando, M.D., reviewed the record and affirmed Dr. Lyon's opinion that plaintiff could perform simple work. AR 321, 339.

In April 2004, plaintiff requested a change in medication due to sedation, but had no other complaints. AR 553. In July 2004, plaintiff told Dr. Cohn that she had some relationship problems with her husband and was in physical pain, so Dr. Cohn adjusted her medication. AR 546. In August and September 2004, plaintiff reported that she was about the same. AR 544-45.

In a letter dated September 15, 2004, Dr. Goodwin noted that plaintiff's migraines were "successfully controlled" with frequency of one to two headaches every few months, but that her husband's recent military activation brought on more headaches. AR 542. Plaintiff reported that her opiate usage made her "able to bathe her children, vacuum the house, cook and carry out her

activities of daily living in a way that she was unable to before."

In October 2004, plaintiff told Dr. Cohn that she was three months pregnant, and he refilled her medications. AR 541. In November and December 2004, plaintiff requested reduced narcotics medication due to her pregnancy. AR 539-40.

In January 2005, Dr. Cohn adjusted plaintiff's medication, which provided "good control" of symptoms. AR 537-38. In February 2005, plaintiff reported that her pain was "fairly well stabilized" but felt more achy during pregnancy. AR 536. Plaintiff stated "her emotional well being is doing well."

In a letter dated April 14, 2005, Dr. Goodwin stated that plaintiff could increase her medication dosage and was "clearly a highly function-ing individual with respect to taking care of five children." AR 532. On April 16, 2005, plaintiff gave birth to her sixth child via caesarean section, and thereafter developed postoperative anemia, for which she was treated and released with instructions not to lift anything for six weeks. AR 360, 413.

In May 2005, Dr. Goodwin noted that plaintiff was "doing fairly well with respect to her pain," but was having some postpartum depression. AR 526. In June 2005, plaintiff saw Dr. Goodwin on follow-up to discuss her treatment. AR 524. In July 2005, Dr. Goodwin expressed concern over the high dosage of narcotics plaintiff used. AR 522.

In August 2005, plaintiff told Dr. Goodwin that she felt stressed and had a bad migraine headache two weeks prior. AR 520. Dr. Goodwin recommended cutting back on her prescription dosages and counseling. Also in August 2005, Dr. Cohn noted Dr. Goodwin's concerns regarding opiate addition. AR 518.

In a letter dated September 28, 2005, Dr. Goodwin recounted plaintiff's diagnoses, treatment and medications. AR 581-85. Dr. Goodwin noted that while he trusted plaintiff, "there are some things that do not seem to 'add up.'" AR 582. Dr. Goodwin noted that plaintiff had failed to make or attend appointments with various physicians, and that plaintiff's reasons for this failure did not correspond to the reasons those physicians gave. For instance, one doctor

stated that plaintiff no-showed an appointment after scheduling the appointment personally with the doctor and reconfirming with the office manager, yet plaintiff "strongly" denied ever having spoken to the doctor or the manager.  AR 582.  The doctor also stated that plaintiff attended only two of eight counseling sessions because she refused to pay her insurance co-pay, yet plaintiff stated that the doctor cancelled the remaining classes.  Plaintiff also stated that she "left at least 10 messages without a response" from another doctor, which Dr. Goodwin stated was "completely out of character" for the doctor, whom he personally knew.  AR 582.  Dr. Goodwin also stated: "I saw [plaintiff] around town on a number of occasions (she didn't necessarily see me) where she was fully alert and actively managing the very difficult task of handling five young children in restaurants and shopping etc."  AR 583.

Between October 2005 and February 2006, plaintiff received medication adjustments from Dr. Goodwin to reduce the amount of narcotics she ingested.  AR 479-87, 490.  By December 2005, her fibromyalgia flares had "died down" and she planned to travel to Washington.  AR 482.  In January 2006, Dr. Goodwin noted that plaintiff had reduced her narcotics usage by 50 percent, and recommended that she "actively participate" in a physical conditioning, exercise and weight loss program.  AR 479-80.

In February 2006, Dr. Goodwin noted that plaintiff was functioning at about the same level as before on under 50 percent of the opioids that used to be her baseline amount.  AR 490. Dr. Goodwin indicated that plaintiff "experiences fairly frequent tension-type headaches but now has migraines only rarely."  *Id.*  Dr. Goodwin indicated that plaintiff "has a chronic painful condition and has been unable to function properly without opioids, prescribed on a chronic basis.  Given that her level of function has been better on the opioids than off, I feel that it is justified for her to remain on them [as long as certain conditions were met] and as long as the dose is kept way down!"  AR 491.  Dr. Goodwin requested regular updates so that he could continue to advise plaintiff on her pain management and the numerous factors ("concerning emotional and physical well being") it depended upon.  AR 492.

III.    SUMMARY OF TESTIMONY AT ADMINISTRATIVE HEARING

A.    Plaintiff's Testimony

At the hearing, plaintiff testified that she stopped working due to migraine headaches, constant pain and numbness in her extremities, and back pain.  AR 618, 622-23.  She testified that she had taken so much Tylenol for so long that she had liver problems which caused fatigue and vomiting, and she could not take Ibuprofen due to a gastrointestinal stapling procedure she had to help her lose weight.  AR 621-22.  She testified that after Dr. Goodwin put her on opiates (Oxycontin and Methadone), her life got "closer to normal than it has in years," and she was finally able to help with dinner, do dishes, and bathe her kids.  AR 626, 623.  However, she testified that there was "no way" she could work because she could not make herself available to an employer with any assurance of regular attendance.  AR 626.  When asked how she manages the family with six kids, plaintiff explained that the two oldest (ages 14 and 17) do a lot to help. Plaintiff testified that her mother, who was 73 years old but "in better shape than I am," has lived with them off and on, and when plaintiff's husband is gone, her mother moves in to help out. AR 628.

Plaintiff testified that she was currently having two to three migraines a month which cannot be stopped even with medication.  AR 631.  She testified that her migraines require her to lie and cry in a dark room and usually last two or three days.  *Id.*  She testified that during her migraines, she cannot move, she throws up, and since she cannot hold down her pain prescriptions, she begins withdrawal from the opiates.  *Id.*  Even after the migraine passes, she testified that she still has a headache and is afraid to bend wrong or look at the light in the wrong way or for the kids to scream, any of which would bring it back.  *Id.*

She testified that she cannot predict the days when her pain will be "horrible," but explained that 60-70 percent of the time her days were affected by severe pain and by fatigue. AR 631-33.

////

B.    Vocational Expert Testimony

At the hearing, the VE testified that assuming plaintiff cannot lift and carry more than ten pounds frequently with an occasional twenty pound maximum; that she is limited to standing or walking two hours out of eight; that she needs to change position; that she could not climb ladders or use scaffolds; that she is limited to occasional stair climbing, ramp negotiation, balancing, stooping, kneeling, crouching, and crawling; that she can follow simple instructions; and that she has moderate limitations understanding, remembering and carrying out detailed instructions, there were significant jobs in the national economy that plaintiff could do.  AR 637-38.  The VE also testified that if plaintiff is absent more than two times a month on an unpredictable basis, needs to withdraw from the workplace and go home, or needs to quit for rest, she would be called in for attendance or be terminated within 30 days.  AR 639.  The VE testified that in unskilled and semiskilled jobs, the maximum number of absences typically permitted is two per month.  AR 640.

IV.    ISSUES PRESENTED

In her complaint, plaintiff contends that the denial of her disability benefits was erroneous because (1) the ALJ did not properly evaluate the combined effect of plaintiff's medically verified impairments, (2) the ALJ based his decision on a specific quantum of supporting evidence, without considering the record as a whole, (3) the ALJ rejected plaintiff's pain and other subjective symptom testimony without making specific findings stating clear and convincing reasons for doing so, (4) the ALJ improperly relied on evidence of plaintiff's ability to carry on certain daily activities, (5) the ALJ failed to give proper consideration to the diagnoses, opinions and ultimate conclusions of plaintiff's treating pain specialist, and (6) the ALJ based his decision on the opinion of the VE, based on an incomplete hypothetical which failed to accurately reflect plaintiff's condition; and by disregarding the VE's answer when questioned concerning plaintiff's actual condition as evidenced by the record.  Pl.'s Mot. for Summ. J. at 5-6.

V.    LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is more than a mere scintilla, but less than a preponderance.  *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v. Barnhart*, 278  F.3d 947, 954 (9th Cir. 2002).

VI.    ANALYSIS

A.    Failure to Consider Combined Impairments/Failure to Consider Entire Record/Failure to Consider Testimony of Treating Pain Specialist

Plaintiff contends the ALJ erred by failing to properly evaluate the combined effect of plaintiff's medically verified impairments, by basing his decision on a specific quantum of supporting evidence without considering the record as a whole, and by failing to give proper consideration to the diagnoses, opinions and ultimate conclusions of Dr. Goodwin, plaintiff's treating pain specialist.  Pl.'s MSJ at 6.  Plaintiff argues that "[c]ontinually throughout over three years of treatment, Dr. Goodwin repeatedly underscored the intensity and severity of

Plaintiff's chronic pain condition." *Id.* Plaintiff argues that "[t]he ALJ in reviewing and evaluating these extensive records and reports apparently picked and chose isolated excerpts when treatment was successful, when Plaintiff reported improvement and when Plaintiff was able to do housekeeping and child rearing activities (when her prescribed treatment kept her multiple debilitating pain conditions at bay)." *Id.* at 7. Plaintiff contends that the record as a whole does not provide a substantial evidentiary basis for the ALJ's conclusion that plaintiff is not disabled. *Id.*

Defendant counters that the record evidence belies plaintiff's allegations and that plaintiff "is unable to point to any ongoing, contemporaneous objective clinical findings that support her subjective statements that she is more limited tha[n] the RFC for a reduced range of light work." Def.'s Mot. for Summ. J. at 10, 11. Defendant contends that Dr. Goodwin's "treatment records showed that plaintiff experienced improvement in her symptoms and remained quite functional" during the time he treated her, and that neither Dr. Goodwin nor any other doctor opined that plaintiff was unable to work. *Id.* at 11.

Contrary to plaintiff's contentions, there is no indication that the ALJ failed to properly evaluate the combined effect of plaintiff's medically verified impairments or failed to consider the record as a whole. There is also no indication that the ALJ failed to give proper consideration to the diagnoses, opinions and ultimate conclusions of Dr. Goodwin.[4] To the contrary, the ALJ acknowledged plaintiff's medical impairments and addressed many of Dr. Goodwin's opinions and conclusions in his August 2006 decision. The ALJ specifically stated that he "accepts . . . Dr. Goodwin's opinion that [plaintiff] is a highly functioning individual, as

---

[4] To the extent plaintiff contends that the ALJ erred by rejecting a specific opinion of Dr. Goodwin, plaintiff has not indicated what, if any, specific medical opinion the ALJ rejected. Dr. Goodwin did not specifically opine that plaintiff was physically or mentally limited in her ability to work or that she was unable to work. *See Morgan v. Comm'r*, 169 F.3d 595, 601 (9th Cir. 1999) (treating doctor's reports did not show how the claimant's symptoms translated into specific functional deficits which precluded work activity).

Dr. Goodwin has a long treatment history with [plaintiff]." AR 25. The ALJ also specifically indicated that he accorded substantial weight to the administrative findings of fact made by the state agency physicians, even though they were not examining or treating sources, because they were "not inconsistent with the medical evidence as a whole" and "no treating or examining physician ever recommended that [plaintiff] could not work, and repeatedly noted her ability to function and raise six children." *Id.*

Moreover, a review of the record – including all of Dr. Goodwin's treatment records – reveals that there was sufficient evidence to support the ALJ's finding that plaintiff is not disabled. In August 2002, Dr. Goodwin found that "[i]n terms of [plaintiff's] activities of daily living, she neither lets her headaches nor her chronic pain get the better of her." AR 240. That same month, plaintiff told Dr. Cohn that she was doing "significantly better" with her depression. AR 278. The next month (September 2002), plaintiff told Dr. Cohn that she was "doing better" and had not had a migraine, and that her depression and sleeping patterns were better. AR 275. The next month (October 2002), Dr. Goodwin stated that plaintiff was "doing wonderfully" and "only had two minor migraines in the past two months [which was] a huge improvement." AR 237. He added that "[o]verall, she is doing so much better." *Id.*

In December 2002, Dr. Goodwin indicated that plaintiff "only had one migraine over the past month and no other headaches at all." AR 235. He indicated that her endometriosis "is problematic every time she has a menstrual period" but that the medication she was on "has made a huge difference to her pain." *Id.* Dr. Goodwin stated that the medication "not only eliminates the endometriosis-related pain but it also eliminates her fibromyalgia pain to the point where it becomes the most functional and productive time[s] during the whole month!" *Id.* At that time, Dr. Goodwin also stated that plaintiff "is very energetic [and] participates in a lot of activities with her husband and her son." AR 236.

In January 2003, Dr. Goodwin stated that "things ha[d] changed immensely" with plaintiff. AR 233. He indicated that plaintiff "has gone through a number of stressful situations

without the usual exacerbation of pain" and that "[h]er frequency of migraine has dropped from several times per week to once monthly and this has been consistent now for two or three months." *Id.* He stated that the combination of her medication "works wonderfully well" and that plaintiff "is able to do housework, baking, interacts far more actively with her family, was very active around the Christmas holidays, has more energy and feels 'more myself.'" *Id.* Dr. Goodwin stated that plaintiff "seems to be a different person entirely" and "[n]ow that her pain is well controlled she is very much more functional and doing really well." *Id.*

In April 2003, plaintiff told Dr. Cohn that her "pain control is good" and that she was "doing fairly well" and "well satisfied w/her pain control." AR 262. The next month, plaintiff told Dr. Cohn that her "energy is good, her depression is fairly well controlled." AR 260.

In June 2003, Dr. Andrews indicated that plaintiff "could deal with a job, the public, and supervisors, and fellow employees" and "has no severe mental disorder that would prevent her from working." AR 181. The next month (July 2003), Dr. Pong opined that plaintiff could perform a reduced range of light work that included occasional postural limitations and Dr. Lyons opined that plaintiff could perform simple work. AR 312-20, 321-34, 337-41.

Although plaintiff appeared to have a setback in September 2003, in October 2003 she reported that her depression was "fairly well controlled" and that she had not had a significant migraine headache in two months. AR 250. Again, although in November 2003 plaintiff returned to see Dr. Goodwin and told him that her pain overall had increased dramatically, Dr. Goodwin then modified her medication regimen. AR 229, 230. At the same time, Dr. Goodwin noted that plaintiff's migraines were "still under good control using simply vitamin B and . . . magnesium supplements." AR 229.

By January 2004, plaintiff told Dr. Cohn that she was "doing fairly well" and that her pain control was "fairly good." AR 246. In February 2004, Dr. Cohn noted that plaintiff "continues to get fairly good pain control" from her medication. AR 558. In March 2004, Dr. Cohn adjusted her medication regimen, and she reported that "she's doing fairly well." AR 557,

554. Also in March 2004, a state agency doctor, consistent with Dr. Pong's opinion, opined that plaintiff could perform a reduced range of light work, and Dr. Morando affirmed Dr. Lyon's opinion that plaintiff could perform simple work. AR 320, 321, 339.

In April 2004, plaintiff requested a change in medication due to sedation, but had no other complaints. AR 553. From July through September 2004, plaintiff told Dr. Cohn that she had some relationship problems with her husband and was in physical pain. AR 544-46. However, in September 2004, Dr. Goodwin noted that plaintiff's migraines were "successfully controlled" with frequency of one to two headaches every few months, and noted that plaintiff's opiate usage made her "able to bathe her children, vacuum the house, cook and carry out her activities of daily living in a way that she was unable to before." AR 542.

In January 2005, Dr. Cohn adjusted plaintiff's medication, which provided "good control" of symptoms. AR 537-38. In February 2005, plaintiff reported that her pain was "fairly well stabilized." AR 536. Plaintiff stated "her emotional well being is doing well."

In April 2005, Dr. Goodwin stated that plaintiff was "clearly a highly function-ing individual with respect to taking care of five children." AR 532. In May 2005, Dr. Goodwin noted that plaintiff was "doing fairly well with respect to her pain." AR 526.

In September 2005, Dr. Goodwin stated that "there are some things that do not seem to 'add up'" with regard to plaintiff's failure to attend various, prescribed therapy and doctors appointments, in that her excuses for failing to attend these appointments did not make sense and did not correspond to the reasons these medical professionals gave Dr. Goodwin for her failure. AR 582. Dr. Goodwin also noted, "I saw [plaintiff] around town on a number of occasions (she didn't necessarily see me) where she was fully alert and actively managing the very difficult task of handling five young children in restaurants and shopping etc." AR 583.

By December 2005, plaintiff's fibromyalgia flares had "died down" and she planned to travel to Washington. AR 482. In January 2006, Dr. Goodwin noted that plaintiff had reduced her narcotics usage by 50 percent, and recommended that she "actively participate" in a physical

conditioning, exercise and weight loss program.  AR 479-80.

In February 2006, Dr. Goodwin noted that plaintiff was functioning at about the same level as before on under 50 percent of the opioids that used to be her baseline amount.  AR 490. Dr. Goodwin indicated that plaintiff "experiences fairly frequent tension-type headaches but now has migraines only rarely."  *Id.*

Accordingly, there was sufficient evidence in the record to support the ALJ's finding that plaintiff was not disabled.  To the extent the record could be found to be "susceptible to more than one rational interpretation" regarding plaintiff's disability, the ALJ's decision was one of those rational interpretations and it must be upheld.  *Thomas*, 278 F.3d at 954.

B.     Rejection of Plaintiff's Testimony

Plaintiff also contends the ALJ erred by rejecting her pain and other subjective symptom testimony without making specific findings stating clear and convincing reasons for doing so and by improperly relying on evidence of plaintiff's ability to carry on certain daily activities.  Pl.'s Mot. for Summ. J. at 17.  Plaintiff argues that in light of the history of her treatment for multiple medical conditions during the time of her disability claim, especially the reports and opinions of Goodwin, the ALJ's findings "fall far short of being clear and convincing."  *Id.*

Defendant counters that "the ALJ did not completely discount Plaintiff's pain and symptom complaints" and instead "accepted Plaintiff's complaints to the extent that they limited her to an RFC for a reduced range of light work activity, that included the option to change positions, and required no more than occasional postural movements and simple work."  Def.'s Mot. for Summ. J. at 13.  Defendant contends that the "only credibility challenge Plaintiff raises is that the ALJ allegedly misconstrued her daily activities in assessing her limitations."  *Id.* at 14. Defendant argues that "Plaintiff's ability to actively care for five children, while she was pregnant with her sixth child, was highly relevant to the ALJ's credibility analysis and showed that her allegations of reduced physical and mental activity were not supported."  *Id.*

////

At the hearing, plaintiff testified that there was "no way" she could work because 60-70 percent of the time her days were affected by severe pain and by fatigue. AR 631-33. Plaintiff also testified that she was having two to three migraines a month which cannot be stopped even with medication, and that those migraines require her to lie and cry in a dark room and usually last two or three days. AR 631. In his August 2006 decision, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." AR 22-23.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ's discretion if the ALJ used the proper process and provided proper reasons. *See, e.g., Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. *Albalos v. Sullivan*, 907 F.2d 871, 873-74 (9th Cir. 1990); *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

The Ninth Circuit recently reiterated the two-step analysis that an ALJ must engage in when determining whether a claimant's testimony regarding subjective pain or symptoms is credible:

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir.1991) (en banc) (internal quotation marks omitted). The claimant, however, "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir.1996). "Thus, the ALJ may not reject subjective symptom testimony ... simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." *Id.*; *see also Reddick*, 157 F.3d at 722 ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").

> Second, if the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281; *see also Robbins*, 466 F.3d at 883 ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each.").

*Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). To support a lack of credibility finding, the ALJ must "point to specific facts in the record which demonstrate that [the claimant is in less pain or the claimant's symptoms are less severe] than she claims." *Vasquez v. Astrue*, 547 F.3d 1101, 1105 (9th Cir. 2008).

Here, the ALJ found plaintiff's testimony as to the extent of pain and physical limitation not credible for numerous reasons. *See generally* AR 23-25. The ALJ found that: (1) although plaintiff complained in May 2002 of widespread pain and swelling and numbness in her hands and feet, "during a physical examination in May 2002, she had normal gait and station, was able to walk on her toes and heels and tandem walk"; (2) although plaintiff complained in June 2002 of numbness in her upper extremities and low back pain, "there was no evidence of cervical radiculopathy or carpal tunnel syndrome"; (3) although plaintiff complained in November 2002 of increased back pain, she "noted that she had been performing more than her normal amount of housework and had been 'quite physically active with her children,'" and a physical examination the same month revealed that "she was able to stand on her toes, walk on her heels and bend over past her knees to try and touch her toes"; (4) by January 2003, Dr. Goodwin had reported that things had changed immensely, that plaintiff was able to deal with stressful situations without pain, that the frequency of migraine headaches had decreased from several a week to once a month, and that plaintiff "was able to perform housework, bake, interact 'far more actively with her family [and] was very active around the Christmas holidays' with increased energy"; (5) also in January 2003, Dr. Cohn reported that plaintiff was doing "markedly better"; (6) in April 2003, plaintiff reported good pain control; (7) in May 2003, plaintiff reported good energy with no

other complaints and planned to travel to Utah; (8) in June 2003, plaintiff "was taking vitamin B12 and magnesium to decrease the frequency of headaches"; (9) in October 2003, plaintiff told Dr. Cohn "that she had not had a significant migraine for two months and had not needed to take Imitrex"; (10) by November 2002, Dr. Goodwin observed that "vitamin B12 and magnesium supplements maintained [plaintiff's] migraines under good control and Imitrex alleviated breakthrough headaches"; (11) plaintiff's "pain control and progress continued to improve, and treatment notes throughout 2004 revealed an uncomplicated pregnancy, numerous trips and moving residence in May 2004"; (12) by February 2005, plaintiff "reported that her pain was fairly well stabilized and had adequate pain relief"; (13) in April 2005, Dr. Cohn noted that plaintiff "was 'clearly a highly function-ing individual with respect to taking care of five children'"; and (14) by February 2006, "Dr. Goodwin reported that although it had taken time, [plaintiff] was able to function at the same level she had previously, on under 50% of opioids, and she reported that the severity of tension headaches had improved and she rarely experienced migraine headaches." AR 23-24.

The ALJ noted that although plaintiff "repeatedly complained of various stressors, which included raising 6 children alone while her husband was on activity duty abroad, Dr. Goodwin indicated in September 2005 that he 'saw her around town on a number of occasions (she didn't necessarily see me) where she was fully alert and actively managing the very difficult task of handling five young children in restaurants and shopping etc.'" AR 24. The ALJ concluded that "[w]hile undoubtedly there is a reasonable nexus between [] some of [plaintiff's] symptoms and the objective medical evidence . . . , the degree of pain and physical limitations [is] exaggerated." *Id.* The ALJ added:

> There is certainly no evidence suggestive of an inability to engage
> in substantial gainful activity since the alleged onset date of
> disability, as no physician, treating or otherwise, has advised her
> not to work on that date. The objective evidence falls short of
> demonstrating the existence of pain and limitations that are so
> severe that [plaintiff] cannot perform any work on a regular and
> continuing basis. Her activities of daily living have not been

excessively compromised by her impairments as she is able to independently manage personal hygiene, raise young children, and travel.

*Id.*

Other than arguing that the ALJ erred by "picking and choosing" isolated excerpts from the record, plaintiff does not challenge the accuracy of the ALJ's specific findings regarding her credibility. She does argue that the ALJ's reference to her daily activities does not amount to clear and convincing evidence that she is not credible since the evidence regarding those activities is not inconsistent with her claims of disability. Pl.'s Reply at 13. She contends that there is no evidence that she "is able to spend a substantial part of her day performing household chores or other activities that are transferrable to a work setting where she would be required to persist in productive activity eight hours a day, five days a week, day-in and day-out, week-in and week-out." *Id.*

"[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations. . . . Only if the level of activity were inconsistent with Claimant's claimed limitations would these activities have any bearing on Claimant's credibility." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (citing *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 530-531 (6th Cir. 1992) (ruling that a claimant should not be penalized for attempting to maintain some sense of normalcy in her life); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("Many home activities are not easily transferable to . . . the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication.")). Here, there is evidence in the record that plaintiff performed housework, baked, took care of six children on a regular basis, and even traveled out of the state on more than one occasion. Such activities do not seem consistent with plaintiff's claims that 60-70 percent of the time her days were affected by severe pain and by fatigue and that she has two to three migraines a month which usually last two or three days each. Nonetheless, the ALJ's finding regarding plaintiff's daily activities was only one of many reasons he provided for rejecting her credibility.

The ALJ's "specific, cogent reasons" for his disbelief of plaintiff were clear and convincing, especially in light of the numerous inconsistencies between the medical evidence and plaintiff's statements regarding the severity of her pain and other symptoms.  Because the ALJ used the proper process and provided proper reasons for discrediting the severity of plaintiff's symptoms, the court defers to the ALJ's discretion and upholds the ALJ's finding that plaintiff is not disabled.[5]

VII.    CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that:

1.  Plaintiff's motion for summary judgment or remand is denied,

2.  Defendant's cross-motion for summary judgment is granted, and

3.  The Clerk is directed to enter judgment in the Commissioner's favor.

DATED:  March 30, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

---

[5]  Plaintiff also contends, in a conclusory manner, that the ALJ erred by improperly basing his decision on the opinion of the VE, based on an incomplete hypothetical which failed to accurately reflect plaintiff's condition; and by disregarding the VE's answer when questioned concerning plaintiff's actual condition as evidenced by the record.  Pl.'s Mot. for Summ. J. at 6. However, because the ALJ did not improperly discredit plaintiff's testimony, it was not erroneous for him to rely on the hypothetical that he did as the basis for his August 2006 decision.  *Embrey v. Bowen*, 849 F.2d 418, 422-23 (9th Cir. 1988) (hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence); *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant).